***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Taylor with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the Workers' Compensation Act. *Page 2 
2. An employment relationship existed between Plaintiff and Employer at all times relevant to this claim.
3. This is a claim for an occupational disease of the lungs.
4. Plaintiff's average weekly wage is sufficient to yield the maximum compensation rate for 1996.
5. The parties stipulated the following into evidence:
 a. Stipulated Exhibit 1: Mr. Lewis' May 27, 2004 deposition;
 b. Stipulated Exhibit 2: Banbury Material list;
 c. Stipulated Exhibit 3: Samuel Lewis' death certificate;
 d. Stipulated Exhibit 4: Industrial Commission Orders;
 e. Stipulated Exhibit 5: Industrial Commission forms;
 f. Stipulated Exhibit 6: Samuel Lewis' medical records;
 g. Stipulated Exhibit 7: Material Data Safety Sheets (MSDS);
 h. Stipulated Exhibit 8: Plaintiff's discovery responses;
 i. Stipulated Exhibit 9: Defendants' discovery responses;
 j. Stipulated Exhibit 10: Personnel records;
 k. Stipulated Exhibit 11: Plant medical records; and
 l. Stipulated Exhibit 12: Industrial Hygiene data.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. Decedent, Mr. Samuel Lewis, was born on March 7, 1925 and died on June 6, 2004 at age 79. The decedent was employed by the Employer-Defendant in the Banbury Department as a Banbury Operator from 1977 to 1996. Mr. Lewis was responsible for getting raw rubber stock and putting chemical compounds on top of it and moving it via a conveyor system into the Banbury itself.
2. The Banbury is an enclosed machine that processes and mixes the rubber and chemicals to produce the ultimate rubber compounds that will be used to make the various components of a tire. The materials that were used by Mr. Lewis to mix with the raw rubber stock for delivery into the Banbury consisted of pelletized and/or powdered chemicals that were weighed on a scale at his operator station and then placed on top of the rubber for delivery into the Banbury.
3. Carbon black oil and carbon black are two components of the mix that makes up the rubber components for a tire. Those two compounds are delivered automatically into the enclosed Banbury and the operators, such as Mr. Lewis, are not required to personally handle these components.
4. The recipes for the Banbury typically call for approximately 100 pounds of rubber. The Banbury that Mr. Lewis operated was one that made non-productive batches which did not contain the array of chemicals that are run in so-called productive batches. Mr. Lewis' Banbury ran 95% non-productive batches which would indicate that three to four, maybe six chemicals, are used in that Banbury. It takes approximately one minute to put the pelletized/powdered/granular chemical on a scale and then on top of the rubber to go into the Banbury. There is very little dust created in this process. *Page 4 
5. There are dust collection systems on the Banburys. On rare occasions, these dust collection systems may develop a fire in them. Ron Bogle, the supervisor over that area since 1985, could remember only one fire.
6. There are exhaust fans that are available to remove air from the Banbury area to the outside of the plant. There is also fresh air supply ventilation that supplies fresh air from the outside into the Banbury. In addition, there are personal fans that the operators might use to blow air onto themselves individually, but they are placed by the operator in a position that does not impact the weighing of the chemical compounds or the blowing of any of the pelletized/powdered/granulated materials over the Banbury.
7. The chemicals are delivered in bags. From time to time the bags will break but no significant airborne concentration of the compound becomes airborne. There is also a phenomenon called a blow back that happened on rare occasions in the Banbury Department. When a Banbury builds up excessive pressure which gets to the point that it overcomes the charging board, a blow back can occur. As a supervisor in that area since 1985, Mr. Bogle could recall three occasions when a blow back occurred. They were very rare.
8. All the Banbury machines are located in one large area. The area is very dusty and dirty. The people who work in the area became very dirty. However, air sampling was conducted at Goodyear the entire time that Mr. Lewis was employed. Air sampling did not reflect any overexposures to any substances or compounds by Banbury operators, including in particular, Mr. Lewis.
9. Dr. Brian Caveney, an occupational disease specialist, was called to testify for Plaintiff. Based on his review of the materials that were provided by Plaintiff, which initially did not include any industrial hygiene surveys, Dr. Caveney was of the opinion that Mr. Lewis' *Page 5 
employment at Goodyear was a significant causal factor in the development of Mr. Lewis' chronic obstructive pulmonary disease and his death, and that Mr. Lewis, as a result of that employment, was placed at an increased risk relating thereto. Dr. Caveney is board-certified in occupational and environmental medicine and spends 50 percent of his time seeing patients as well as teaching at Duke University Medical Center where he is a clinical associate. Dr. Cavaney also went to law school and is licensed to practice law in North Carolina.
10. Dr. Caveney rendered opinions in this case after reviewing decedent's medical records, medical literature relevant to this matter and hearing and deposition testimony. Dr. Caveney testified in his deposition of March 22, 2006, about various chemical compounds, including naphthenic rubber oils, phenol, carbon black, formaldehyde, and nitrosamines. He agreed that he did not understand how Goodyear used those compounds, or to what extent, at what time or in what percentages any of those chemicals, to which he assumed Mr. Lewis was exposed, were used. Dr. Caveney also agreed that Mr. Lewis had developed significant emphysema which involves destruction of lung tissue and inability of the lung to pass gases into and out of the alveolar spaces and into and out of the bloodstream. This ultimately results in the development of significant carbon dioxide retention, inability of the lungs to appropriately oxygenate the blood and can result in death. Dr. Caveney does not know to what extent polycyclic aromatic hydrocarbons (PAHs) were involved, if at all, in rubber production at Goodyear, and he has no information that makes him think that PAHs were either in the plant or were bioavailable to people like Mr. Lewis.
11. Dr. Caveney further testified that he had no information that formaldehyde resulted in any irritation of Mr. Lewis' lungs at the levels found in the plant. He ultimately agreed that the levels of formaldehyde in the Goodyear plants are hundreds, if not thousands of *Page 6 
times, below the minimum level thought to cause irritation and agreed that the levels are not ones that would cause pathology in the lung, or place an individual at an increased risk for the development of disease.
12. Dr. Caveney agreed that there was no evidence to suggest that carbon monoxide which was sampled in the plant had anything to do with the development of Mr. Lewis' disease. He made assumptions about exposure that Mr. Lewis may have had to phenol, but acknowledges that he has no understanding of whether phenol was even available or around Mr. Lewis' work station, and agrees that ultimately it may have no relevance at all to Mr. Lewis' claim. He agrees that napthenic rubber oils, which are automatically delivered into the enclosed Banbury and are not handled by Mr. Lewis, may have nothing to do with Mr. Lewis' emphysema.
13. Dr. Caveney initially indicated that Mr. Lewis may have had some personal susceptibility to nitrosamines. He based this on the fact that Mr. Lewis had bladder cancer, but Dr. Caveney acknowledged that he could not state to a reasonable medical probability that nitrosamines were causally related to bladder cancer, and therefore, he could not make a leap of faith that they were in any fashion attributed to Mr. Lewis' lung disease.
14. Dr. Caveney is unaware whether hydrocarbons are bioavailable to workers in the plant. Formaldehyde was found at very minimum levels which are not known to cause pulmonary irritation. Nitrosamines were found in the plant but no epidemiology is available to support any relationship between the same and the development of lung disease.
15. Dr. Caveney relied on a number of articles to establish a relationship between Mr. Lewis' employment and the development of his chronic obstructive pulmonary disease. The articles, however, including ones by Gardiner and Tongeren, do not support the relationship that he asserts as it specifically relates to Mr. Lewis' employment at Goodyear. Mr. Lewis ultimately *Page 7 
developed significant endstage emphysema with hyperinflation of his lungs, significantly increased total lung capacity and very significant increases in his residual volume. He also developed a severe reduction in his forced vital capacity on spirometric testing. Dr. Caveney agreed that none of those findings, which are classical for emphysema, were causally related to Mr. Lewis' employment.
16. In his rebuttal deposition, Dr. Caveney's addressed evidence offered by the Defendant through Drs. Utell and Lockey. Dr. Caveney used a graph that showed that by 1961, if you assume that the Lockey and Utell assumptions are correct, Mr. Lewis would have evidence of fixed obstruction by that time. It was Dr. Caveney's opinion that because he assumed Mr. Lewis did not begin smoking until 1961, the fixed obstruction that he had developed by that time could not be explained on the basis of cigarette smoking. However, the evidence and its greater weight in this case suggests that Mr. Lewis was smoking by at least 1946 and continued to smoke thereafter, up to and including at least 1961. Dr. Caveney acknowledged that if his assumption was incorrect and that if Mr. Lewis had begun smoking in line with the testimony by his wife by 1946, then the assumptions that he made pursuant to the graph were incorrect and that even the extrapolation back to 1961 showing fixed airway obstruction was plausibly explained by the fact that he had been smoking for some fifteen years prior thereto.
17. Defendant offered the testimony of Dr. Mark Utell who is board-certified in internal medicine and pulmonary medicine. Dr. Utell has been involved in research and clinical treatment of those who purport to be exposed to a broad spectrum of particles, chemicals and compounds and how the same might affect the lung. He has received grants or been involved with research for the EPA, the National Institute of Occupational Safety and Health, the National Institute of Environmental Health Sciences, the National Institute of Health, and the Centers for *Page 8 
Disease Control, among others. He is currently Chair of the Research Committee for Health Effects Institute, an organization co-funded by industry and the Environmental Protection Agency focusing on air pollution and the health effects associated therewith.
18. Dr. Utell reviewed Mr. Lewis' medical records, the Industrial Hygiene studies performed at the Goodyear plant during Mr. Lewis' employment and the pertinent medical literature associated with the potential health effects of employment in the tire manufacturing industry and lung disease. Dr. Utell found that Mr. Lewis had developed significant hyperinflation of the lungs which is the most common appearance for emphysema on chest x-ray. He had large bullae and/or destruction of the lung which involves the loss of the alveolar wall structure and again represents a hallmark finding in emphysema. Mr. Lewis' emphysema resulted in the destruction of alveolar walls such that he could not exchange gases in a normal fashion. Mr. Lewis' carbon monoxide diffusion test results were significantly reduced. Those valves are only reduced by the form of chronic obstructive pulmonary disease that constitutes emphysema. It is not reduced in the other forms of chronic obstructive pulmonary disease with the possible exception of asthma, which Mr. Lewis did not have. Mr. Lewis had a pulmonary function test in 1986 which was initially criticized for its validity by Dr. Caveney as having been performed after union members instructed members not to blow as hard as they could to show a poor test result. Dr. Utell reviewed the 1986 study and found that it was valid, reasonable and reliable and used a scientific methodology to explain why it is that that particular study was valid and that a reasonable effort had been given. Even if arguendo this study was not valid, decedent and his dependents are bound by the results of the test, if decedent produced those results by a fraudulent effort. Dr. Caveney in his rebuttal deposition did not dispute Dr. Utell's analysis of that 1986 study or that the 1986 study was consistent with emphysema. Dr. Utell was of the *Page 9 
opinion to a reasonable degree of medical certainty that Mr. Lewis' employment at Goodyear did not cause or significantly contribute to his lung disease or death, and that the employment did not place him at an increased risk for lung disease or death. It was Dr. Utell's considered opinion that Mr. Lewis' lung disease, emphysema, was caused solely by his cigarette smoking history.
19. Dr. James Lockey was also offered by the Defendants in this case. Dr. Lockey is board-certified in occupational medicine, internal medicine, and pulmonary disease. Dr. Lockey is a certified B-reader. He is a Professor of the Department of Internal Medicine (Pulmonary Division) and a Professor in the College of Allied Health Services, Department of Rehabilitation Sciences at the University of Cincinnati College of Medicine. His focus has been in occupational pulmonary disorders and he initiated the Center for Occupational Health at the University of Cincinnati which is a multi-disciplinary clinical center offering a comprehensive occupational environmental medicine clinic, medical surveillance laboratory, pulmonary toxicology services, and a disability management and transitional work program. He has performed investigations for the National Institute for Occupational Safety and Health, the National Institute of Environmental Health Sciences, the National Cancer Institute, The Agency for Toxic Substances and Disease Registry, which is a part of the Department of Health and Human Services, the Ohio Bureau of Workers' Compensation, among others.
20. Dr. Lockey explained that the literature suggests that the impact of carbon black on the lung is probably less even than nuisance dust. The studies that have shown the loss in FEV-1 in carbon black manufacturing workers in Europe is a number low enough that it would be difficult to measure in any epidemiologic study and has no clinical significance. The CT scan of Mr. Lewis' chest showed centrilobular emphysema which is a form of chronic obstructive *Page 10 
pulmonary disease and, as stated in the Surgeon General's report and textbooks on pulmonary medicine, is caused by cigarette smoking.
21. The pulmonary function testing and lung volume testing conducted on Mr. Lewis do not suggest an etiology for his pulmonary difficulties other than cigarette smoking. Dr. Lockey also explained in detail why in his opinion as a pulmonologist the 1986 testing of Mr. Lewis was valid and reasonable. He also concurs that Mr. Lewis' level of hyperinflation with a markedly high residual volume of 318% and a total lung capacity of 162% of predicted are consistent with emphysema and are not typical findings for any other form of chronic obstructive pulmonary disease other than emphysema. Dr. Lockey was of the opinion that Mr. Lewis' lung disease was not caused or significantly aggravated as a result of any occupationally related exposure at Goodyear, and that Mr. Lewis' employment did not place him at an increased risk for the development of his lung disease and was not a causal factor in his death. The literature in the field of occupational medicine does not support the suggestion cited by Dr. Caveney that carbon black or any of the other compounds to which Mr. Lewis may have been exposed caused serious fixed airway disease.
22. Dr. Toeppen-Sprigg is board-certified in preventive and occupational medicine and is a retired Global Medical Director for Goodyear Tire Rubber Co. She is familiar with the worldwide literature relating to carbon black and its potential effects on the respiratory tract. She is aware of no studies that place carbon black in a category of respiratory irritant that would be any different than what one might expect from nuisance dust alone.
23. Dr. Toeppen-Sprigg described the industrial hygiene program at Goodyear and the extent to which Goodyear monitors the environment in their plant. Goodyear has spent over two million hours of industrial hygiene sampling and uses mostly personal monitoring to try to *Page 11 
obtain as accurate information as possible about actual conditions impacting their employees. All of the industrial hygiene testing is supervised by a Certified Industrial Hygienist. The lab at Goodyear is certified by the American Conference of Governmental Industrial Hygienists.
24. Dr. Toeppen-Sprigg discussed studies done in the carbon black manufacturing industry in the United States by Robertson and others. That study was conducted of manufacturers of carbon black who utilized the furnace black method. It is a method that removes all hydrocarbons from the carbon black down to 1/10th of 1 percent. This is contrasted with carbon black that is manufactured by the lamp or channel black method which contains significant contamination with PAHs. Goodyear has been purchasing carbon black that was manufactured only pursuant to the furnace black method since the early 1950s. Hydrocarbon contamination in that type of carbon black is almost non-existent. In the studies performed in the United States of carbon black workers working in furnace black manufacturing facilities, there was no respiratory effect found as a result of exposures to carbon black. The carbon black that is used at the Goodyear plant is automatically injected into the enclosed Banbury and is not handled by the operators of the Banburys. It is only a component of the product made at Goodyear as opposed to being the only product manufactured in the carbon black manufacturing facilities. Despite that fact, workers in the carbon black manufacturing facilities in the United States were not found to be at an increased risk for the development of respiratory problems.
25. Dr. Toeppen-Sprigg was of the opinion that there was no increased risk by virtue of exposure to carbon black or exposures at Goodyear for the development of emphysema of the type ultimately developed by Mr. Lewis. She was of the opinion that there was no increased risk to Mr. Lewis for the development of his respiratory condition, and his respiratory condition was neither caused nor significantly aggravated by his employment. *Page 12 
26. Medical records stipulated into evidence and/or made a part of depositions of Dr. Haas Weston and others reveal that Mr. Lewis, certainly in the latter years of his life, was not suffering from early morning cough, expectoration or hemoptysis that might be associated with the development of chronic bronchitis. The only form of chronic obstructive pulmonary disease from which Mr. Lewis was suffering in the latter years of his life was emphysema. His treating pulmonologist, Dr. J.S. Dave, interpreted his pulmonary function testing as being consistent with severe emphysema.
27. Mr. Lewis' cigarette smoking history is contained in his medical records from Drs. Haas Weston, J.S. Dave, and Thor Klang. They variously reported that he had a cigarette smoking history for 42 years, up to age 60, up to ten years preceding 1996 among others. Decedent's wife testified that Mr. Lewis was smoking by 1946 when she first met him. The medical records and other testimony deemed credible in this case suggest that Mr. Lewis continued smoking up until the mid-1980s and that he was a heavy smoker.
28. The medical records of Dr. Haas Weston and the death certificate signed by him were amended to suggest that Mr. Lewis quit smoking by 1980. This was done at the request of Ms. Lewis after Mr. Lewis had filed his workers' compensation claim. These references are not deemed credible.
29. The Full Commission assigns greater weight to the opinions and testimony of Drs. Utell, Lockey, and Toeppen-Sprigg than that of Dr. Caveney and finds that plaintiff's employment at Goodyear did not cause or significantly contribute to his lung disease or death, and that the employment did not place him at an increased risk for lung disease or death.
29. By the greater weight of the evidence it has been shown that emphysema, the disease from which Mr. Lewis suffered in his later years, and which caused his death, was an *Page 13 
ordinary disease of life and was not one that was either caused or significantly aggravated as a result of his employment with Goodyear Tire and Rubber Company.
30. By the greater weight, the scientific medical evidence in this case shows that Mr. Lewis was not placed at an increased risk for the development of his emphysema and death as a result of his employment at Goodyear.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove by the greater weight that Mr. Lewis sustained an occupational disease within the meaning of N.C. Gen. Stat. § 97-57(13), as interpreted by the Supreme Court in Rutledge v. TultexMills, 308 N.C. 85, 301 S.E.2d 359(1983).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim against the Employer-Defendant Goodyear Tire Rubber Company is hereby DENIED.
2. Each side shall pay its costs of the proceeding.
This the 6th day of January, 2009.
S/___________________ BUCK LATTIMORE COMMISSIONER *Page 14 
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1